RED STAR YEAST & PRODUCTS COMPANY and others, Respondents, vs. MERCHANDISING CORPORATION, Appellant.

*May 6—June 3, 1958.*

For the appellant there were briefs by *Steven E. Keane, John R. Collins,* and *Fairchild, Foley & Sammond,* all of Milwaukee, and oral argument by *Mr. Keane* and *Mr. Collins.*

For the respondents there was a brief by *Whyte, Hirschboeck, Minahan, Harding & Harland,* attorneys, and *Victor M. Harding, Richard P. Buellesbach,* and *Strnad & Strnad* of counsel, all of Milwaukee, and oral argument by *Mr. Buellesbach* and *Mr. Robert P. Harland.*

MARTIN, C. J. Plaintiffs claimed an easement by prescription. The trial court found (finding 5) that the disputed area—

". . . has been used by the plaintiffs herein, and each of them, and their predecessors in title, openly, notoriously, continuously, adversely and under a claim of right from and after the dates hereinafter specified for a parking area, for a service area, for loading and unloading, and for ingress and egress, all in connection with their respective parcels of real estate hereinbefore described, in common with each other and with the defendant herein. . . . Said use by the respective plaintiffs has been from and after the following dates:

"Red Star Yeast & Products Company—1896

"Patek Brothers, Inc.—1915

"Oscar Gash, et al.—since prior to 1937."

This finding is incorporated in paragraph 5 of the judgment, in the same language.

The evidence is undisputed as to the use of the area in question by Red Star, Patek, and Gash during the more than twenty-year period prior to the time when defendant acquired the property. Red Star used it every time its vehicles moved in or out of the garage. The use by Patek and Gash vehicles was usually that of crossing the area in going to and from their loading docks. Finding 5, in that it states that the plaintiffs used the area in question "for a parking area," is too broad. There is no evidence that Patek or Gash vehicles ever parked within the area, though there is evidence that sometimes their larger vehicles encroached upon a small portion of it while parked at their docks during loading operations. Nor does the evidence support any conclusion that Red Star parked its vehicles, in the usual sense of the word, within the disputed area (with the exception hereinafter noted). What "parking" it did was the temporary standing of vehicles which was necessary and incidental to loading and unloading thereof and while awaiting access to its dock, and the trucks were moved immediately after the operations were finished or as soon as there was opportunity of access. The parking was the standing of trucks, with the drivers present, while waiting to be loaded or unloaded. No actual parking of trucks was shown. The evidence indicates that the trucks, while waiting to be loaded or unloaded, were always ready to be moved to make room for others who had a common use of the area.

The only evidence of parking in the sense of storing a vehicle for a period of time was that on Saturdays when Red Star vehicles were washed they were parked on the area after being washed, a practice to which no one objected. Other than that, Red Star used its garage for the storage of automobiles and trucks.

Plaintiffs concede that they never used the area "for a parking area." In their brief they state:

"The easement in question . . . was an easement to cross and use an areaway incidental to loading and unloading operations. It contemplated that a vehicle might stand on the area so long as it was in connection with such operations."

In all particulars, other than that noted above, finding 5 is supported by the evidence. The wording of paragraph 5 of the judgment, in so far as it states that plaintiffs have used the area "as a parking area," should be altered as above indicated to conform to the facts. We may say that it is apparent that the trial court did not intend the broad meaning of the words used in finding 5 and paragraph 5 of the judgment. In paragraph 6 of the judgment it is adjudged that the real estate in question—

". . . is subject to a prescriptive easement appurtenant to the above-described real estate owned by the plaintiffs and by the defendant, and each of them, and their successors and assigns, and all persons claiming under them or any of them, for their use, jointly and severally, and for the use of their respective employees, agents, customers, independent contractors, and invitees, as a common service area for loading and unloading, for ingress and egress, and *for such parking as may be necessary in connection with such loading and unloading.*"

The injunction is against interference with the plaintiffs' "use of said easement for the purposes and in the manner above described." With the change in wording of paragraph 5, the judgment will not then permit any use by the plaintiffs which they did not enjoy under their prescriptive easement acquired prior to 1945.

All the evidence as to prescriptive use by the parties and their predecessors in title prior to 1943 and 1945 was introduced by the plaintiffs, and defendant offered no evidence to to the contrary. The oldest witness was George Butch, aged

seventy-six years, who testified he has been familiar with the use of the area for the past sixty-one years. In 1896 he started working as a driver for the Hoffman Company which occupied the defendant's building. He worked fifty-one years for Hoffman and then worked for Red Star for the last ten years. He testified that Hoffman and Red Star drivers made constant use of the area for the purpose of crossing it with their teams and for turning around in connection with loading and unloading operations; that the same use was made of it after trucks replaced the teams.

Erwin Janik, a route man for Red Star for twenty-one years, testified that he and other Red Star drivers always maneuvered over the disputed area in entering or backing their trucks out of the garage; that no one ever objected to such use, and on occasions when his way was blocked by other vehicles in the area he asked the drivers to move and they complied with his request.

James Verfurth, an employee of Red Star for over thirty years, testified that Red Star had free and unrestricted movement of its vehicles over the area throughout those thirty years and that every vehicle entering or leaving the Red Star garage or loading area used the disputed area; that during all the years prior to 1943 or 1945 Red Star had about 50 trucks moving in and out of the area each day.

Charles Lubenow, secretary of Red Star and with the company for over forty-four years, testified that when he started in 1912 the Hoffman Company and the Jung Company occupied the defendant's building; that the area was used by Red Star in those days much the same as at present; that about thirty-two years ago the alley portion was repaved and he suggested to Hoffman and Jung that they cement the entire area since they all used it for their operations; they agreed and the paving was done and Red Star paid at least one third of the cost. He testified no one ever asked for permission to use the area. Lubenow further testified that up until

fifteen years ago Red Star had nine routes and kept 12 trucks in its garage; that each of these delivery trucks, as well as large tractor-trailers, used the area each day; that Red Star has reduced its routes to three.

Russell Wirth, president of Red Star, testified that the company shipped 780,000 pounds of its product through its garage and loading dock in 1936 and shipments gradually increased to 2,400,000 pounds or a value of $493,000 in 1956.

Norbert Klein, connected with the Patek Company since 1913 and familiar with the area since 1915, testified that Patek trucks always used the disputed area in maneuvering up to and away from the Patek dock; that in 1956 Patek moved in and out of its loading dock 10,000,000 pounds of material and products and that twenty years ago the tonnage was seven per cent higher; that the vehicles of Hoffman and Gash's predecessor, as well as the Patek trucks, and common and contract carriers servicing them, went in and out of the area, "using that space just like joint, common property, that everbody used it."

In *Carmody v. Mulrooney* (1894), 87 Wis. 552, 554, 58 N. W. 1109, the rule is stated as follows:

"When it is shown that there has been the use of an easement for twenty years, unexplained, it will be presumed to have been under a claim of right and adverse, and will be sufficient to establish a right by prescription, and to authorize the presumption of a grant, unless contradicted or explained. In such a case the owner of the land has the burden of proving that the use of the easement was under some license, indulgence, or special contract inconsistent with the claim of right by the other party."

Defendant has offered no evidence to contradict or explain the ancient use of the disputed area and the testimony of the plaintiffs' witnesses, in part set out above, stands undisputed in the record. Thus, the presumption remains that the plaintiffs' use was adverse and under a claim of right.

Defendant contends that its use of the area on many occasions amounted to an exclusion of any possible use by plaintiffs, and cites the rules stated in 17A Am. Jur., Easements, p. 694, sec. 80, as follows:

"One of the essentials to an easement by prescription is that the use and enjoyment must be continuous and uninterrupted. By 'continuous and uninterrupted use' is meant use that is not interrupted by the act of the owner of the land, or by voluntary abandonment by the party claiming the easement. If the use of a way is interrupted, prescription is annihilated and must begin again, and any unambiguous act by the owner, such as closing the way at night or erecting gates or bars, which evinces his intention to exclude others from its uninterrupted use destroys the prescriptive right."

Here there was no unambiguous act of the defendant showing an intention of excluding others from the area until it began the construction of the fence in 1957, the act which precipitated this litigation. There was nothing in the evidence to compel the trial court to conclude that plaintiffs were ever excluded from the area.

In fact, defendant's shipping and receiving clerk, who was on the loading platform many times during each working day and was familiar with the traffic conditions in the courtyard, testified that defendant's vehicles were seldom in anyone's way; and the only other witness for defendant testified that he knew of no time when its use of the area was such as made it impossible for trucks to move through or maneuver into the Red Star garage.

The inference to be drawn from defendant's own testimony is that whatever interference to the plaintiffs' use of the area may have resulted from defendant's operations was temporary and was not an unambiguous act evincing an intention to exclude the plaintiffs from their uninterrupted use of the area.

It is true that the evidence shows the area between these warehouses was often congested. On such occasions, how-

ever, a truck would move around the other vehicles in whatever space might be open, or wait its turn to get in or out, or request that the blocking vehicles be moved. Several of plaintiffs' witnesses testified that when one of defendant's trucks blocked the way the driver moved it upon request so as to permit passage by the plaintiffs.

From this defendant argues that the plaintiffs' use of the area was permissive. We cannot agree. In explaining the situation where vehicles were moved by defendant when plaintiffs requested it, Valentine Olejniczak, defendant's shipping clerk, testified as follows:

"*Q.* As a matter of fact, you might say that was the practice of the neighborhood, to accommodate each other in the movement of vehicles so the vehicles could get in and out? *A.* That is right."

Defendant points to the testimony of Russell Wirth to the effect that he never ordered or directed defendant to remove its trucks from the area because defendant had a superior right to the property; and the testimony of Mr. Lubenow that he never assumed the right to use the property if one of defendant's trucks was there first. This testimony must be viewed in the light of all the evidence. Mr. Olejniczak testified that it was ordinary procedure for the Red Star trucks to use the disputed area in loading at its garage door and in entering and leaving the garage, and defendant made no objection; that when other trucks were in the way they maneuvered around them or waited until the way was cleared. He testified that defendant's trucks passed over the Gash property in carrying on their operations at defendant's loading dock; that he never requested permission from the Gash Company and Gash never objected to such use. He testified that the area was treated as common property and that he never objected except when a truck blocked the way of defendant's trucks, in which case he asked the driver to move.

The practice of requesting defendant to move a truck which blocked passage of the plaintiffs' vehicles does not indicate that the plaintiffs were seeking permission to use the area, but rather that they were requesting accommodation in an area which the parties treated as common property. *Martin v. Meyer* (1942), 241 Wis. 219, 5 N. W. (2d) 788, cited by defendant, is distinguishable on its facts. There, during the asserted twenty-year period of use, the plaintiff, who was seeking to establish the easement, tried to purchase the disputed property and when the owner refused to sell the parties had a quarrel and the owner told the plaintiff to stay off the property. The plaintiff stayed off until the matter was adjusted by the owner giving him permission to use it. The adverse use was not continuous for the twenty-year period and thus the court held that a prescriptive easement had not been established; that the use had been permissive and never would ripen into an easement.

Here the easement had matured before defendant came on the scene. In *Carlson v. Craig* (1953), 264 Wis. 632, 638, 60 N. W. (2d) 395, the defendant in 1944 purchased property over a portion of which plaintiff had acquired prescriptive rights by adverse user. In 1944 and annually thereafter the plaintiff asked permission to continue to use the property. Defendant contended that this demonstrated his use thereof had been permissive at all times. This court held:

"It is equally consistent to determine that the plaintiff was not relying upon permission granted by the defendant but was asserting rights that were established prior to the time the defendant acquired her property. No explanation of the use of the roadway prior to 1944 was offered by the defendant."

That is what we have here,—no explanation of the use prior to defendant acquiring the property is given.

Nor does mere courtesy or neighborly accommodation rebut the presumption arising from long-continued use. In

*Shepard v. Gilbert* (1933), 212 Wis. 1, 11, 249 N. W. 54, it was held:

"It is our conclusion that neither friendship nor close social relations of the owner and initial user can be effective to rebut the presumption. . . . Mere acquiescence at the commencement of a use would not affect its adverse character."

Defendant next contends that the use by plaintiffs was not sufficiently definite to constitute a basis for an easement by prescription, citing the rule stated in 17A Am. Jur., Easements, p. 692, sec. 79, as follows:

"A presumption of grant does not arise in the absence of a claim to a definite right which can be the subject of a grant. A prescriptive right of way, for example, cannot be acquired to pass over a tract of land generally; such right must be confined to a specific way, or a definite, certain, and precise line, which has been used as the right of way. Generally speaking, therefore, the adverse use must have been over a uniform route."

The definite right here is the right to operate trucks over that portion of the area which is necessary to loading and unloading, etc.

The rule as quoted above is not as inflexible as the mere statement of it might indicate. In Restatement, 5 Law of Property, p. 2910, sec. 450, comment *m,* it is stated:

"Some degree of definiteness in the scope or extent of an interest is essential to its recognition as a property interest. Some privileges of use of land are quite definite in outline; others are altogether lacking in definiteness. An example of a privilege of the first sort is the right of way with prescribed boundaries, of the second, the privilege of strolling at pleasure through a field. . . . *The required degree of definiteness varies to some extent with the novelty of the particular use.*" (Emphasis ours.)

As stated in 2 American Law of Property, p. 280, sec. 8.68:

"The scope of an easement created by prescription is necessarily limited to some extent by the use which created it. It is out of that use that the right acquired by prescription arose. *The right acquired is to continue to do the things the doing of which resulted in the creation of the easement.* Yet the exact repetition of the acts which lead to the creation of a prescriptive easement is impossible. A prescriptive easement must permit the making of uses similar to those which produced it or there could be no prescriptive easement. The uses which result in a prescriptive easement furnish a pattern for the uses permissible under the easement rather than exact parallels for them." (Emphasis ours.)

The use of the area in question has not been that of a driveway where a more-precise right of way could be defined. Defendant points to the testimony of various witnesses who gave different estimates of the amount of the area encroached upon by the plaintiffs' vehicles. The judgment covers approximately the easterly two thirds of the disputed area.

The alleged discrepancies in the testimony arise from the fact that maneuvers of different vehicles were being described. Lubenow testified the smaller Red Star trucks used a third of the area, its International truck used half at a minimum. Mr. Fisher, traffic manager for Red Star, testified that the smaller carriers used one half the area, the larger carriers from one half to two thirds. Mr. Klein, vice-president of Patek Brothers, testified that during his forty-two years with Patek, its trucks customarily used at least one half. There was some testimony that vehicles serving the plaintiffs' warehouses sometimes used the entire area.

Considering the peculiar nature of the use, the physical characteristics of the area, and the buildings surrounding it, we consider the evidence sufficiently definite to establish the easement over that portion of the disputed area affected by the judgment.

Defendant suggests that the trial court defined the prescriptive area on the basis of a use which had been made of it for no more than two years, referring to testimony by Mr. Lubenow that he made his estimate of the amount of the area used by observing the International truck in its maneuvers, a movement which has been made only for the past two years. There were numerous statements in the evidence, however, and referred to elsewhere in this opinion, that the operations of trucks, as well as teams, in the area generally followed the same pattern throughout the years.

It is also contended by defendant that the judgment grants to the parties rights which are mutually exclusive or impossible of performance,—that "four different parties have a right to use the same piece of ground at the same time." Such an argument could be made of a single-width driveway. The judgment insures to plaintiffs and defendant alike the common use of the disputed area in the same manner in which it has been used for many years. There is nothing in the record to indicate that the parties have ever encountered insurmountable difficulties in the past. Each of them followed the practice of conducting their operations in the spirit of mutual co-operation so that the area could be used with equal rights to accommodate the necessary operations of all.

It is pointed out that in the past the use of the area by the plaintiffs never interfered with the use by the defendant, and so far as the plaintiffs' use is concerned, they have by prescription the right "to continue to do the things the doing of which resulted in the creation of the easement,"—no more and no less.

*By the Court.*—Paragraph 5 of the judgment is modified as directed in the opinion and, as so modified, the judgment is affirmed. No costs to either party. Appellant to pay clerk's fees.